IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**MICHAEL L. BLACKBURN,**

    **Plaintiff,**

    v.                                      CASE NO. 24-3183-JWL

**JOSEPH REYES, et al.,**

    **Defendants.**

**MEMORANDUM AND ORDER**

    Plaintiff brings this pro se civil rights action pursuant to 42 U.S.C. § 1983. At the time of filing, Plaintiff was in custody at the Wilson County Jail in Fredonia, Kansas. Plaintiff has since been released from custody. The Court granted Plaintiff leave to proceed in forma pauperis. On December 13, 2024, the Court entered a Memorandum and Order (Doc. 6) ("M&O") finding that the proper processing of Plaintiff's claims could not be achieved without additional information, and directing Neodesha Police Department ("NPD") officials to prepare and file a *Martinez* Report. The M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1915A." (Doc. 6, at 8.) The *Martinez* Report (Doc. 12) (the "Report") has now been filed. The Court's screening standards are set forth in detail in the Court's M&O.

**I. Nature of the Matter before the Court**

    Plaintiff alleges that in early March 2023, he was working in a camper parked in his driveway. (Doc. 1, at 2.) Plaintiff alleges that his girlfriend, who was at work at the time, had recently filed a protection from abuse ("PFA") against Plaintiff but they had since made up. *Id.* at 2–3. Plaintiff alleges that they had not been able to go to court yet to have the PFA dropped. *Id.* at 3. Plaintiff alleges that his girlfriend's mother showed up—unaware of the reconciliation—

and called the Neodesha Police Department ("NPD") to advise them that Plaintiff was on the property in violation of the PFA. *Id*.

Plaintiff alleges that the NPD showed up "in full force" and began knocking on the camper and speaking to Plaintiff from outside the window. *Id*. Plaintiff informed them that his girlfriend had given Plaintiff permission to be there "as well as them being witness to the fact of seeing [Plaintiff] on the property all week long." *Id*. Plaintiff alleges that they discussed the matter for approximately 20 minutes, until Plaintiff's girlfriend "made it to the scene to help confirm [Plaintiff's] side of the story." *Id*. at 4.

Minutes before his girlfriend arrived, Plaintiff heard Officer Reyes tell Officer Petty to go to the patrol car and get the OC spray. Plaintiff asked Officer Reyes why he needed the pepper spray and told him that if he would turn on his body camera Plaintiff would come out and give himself up for the misdemeanor traffic ticket warrant that Plaintiff knew about. *Id*. Plaintiff advised Reyes that he has had pills planted on him in the past by law enforcement and Plaintiff remembered that Reyes was "a part of physically abusing" Plaintiff in a 2004 case. *Id*.

Plaintiff alleges that he once again asked the officers to turn on their body cameras, and Plaintiff was getting his keys and coming out. *Id*. at 5. Plaintiff alleges that as he was grabbing his keys, Officer Reyes grabbed the door to the camper and "broke in." *Id*. Plaintiff asked Officer Reyes why he did that and got no response. *Id*. Plaintiff stepped out of the camper and Officer Reyes advised Plaintiff that he was under arrest for the traffic warrant. *Id*.

Plaintiff alleges that he had his keys in one hand and a large lighter in the other hand, with both hands well above his head in a surrender position. *Id*. Plaintiff claims that at this time, Officer Reyes grabbed Plaintiff's right wrist and Officer Petty grabbed Plaintiff's left wrist. *Id*. at 5–6. Plaintiff claims that he turned his head to the right to ask Officer Reyes what they were

doing, and Reyes nodded to Petty who then jumped in front of Plaintiff and pepper-sprayed him. *Id*. at 6.

Plaintiff claims that both officers pressed Plaintiff up against a chain link fence with Plaintiff's neck on the top spikes of the fence. *Id*. Plaintiff was able to push himself back from the fence and went headfirst to the ground as Officer Reyes got on Plaintiff's back and pressed Plaintiff's face against the fence. *Id*. Plaintiff claims that he began yelling for help and for them to just stop and put the handcuffs on Plaintiff. *Id*. at 6–7. Plaintiff believes that another officer was holding off Plaintiff's girlfriend and her mother on the other side of the camper. *Id*.

Plaintiff claims that Officer Reyes cuffed Plaintiff and carried Plaintiff to the police cruiser "after what seemed like 2 minutes of using excessive force to knee [Plaintiff] and press [Plaintiff's] face against the fence." *Id*. at 7. Plaintiff alleges that the heater was turned on full blast inside the cruiser while it was 80 degrees outside. *Id*. Plaintiff alleges that the heat made the pepper spray worse to the point that Plaintiff almost wanted to kick out a window and scream for help again. *Id*. Plaintiff alleges that Officer Reyes stood outside the cruiser taunting Plaintiff until paramedics got there. *Id*. Plaintiff claims that he noticed he had lost three teeth. *Id*.

Plaintiff alleges that he was pulled out of the cruiser for a saline solution to be poured into his eyes. *Id*. at 8. Plaintiff alleges that the paramedics kept "cracking jokes," and purposefully spilling the saline solution down the leg of Plaintiff's shorts "shocking [Plaintiff] in the genitals" to the point that Plaintiff said he was done with being treated like this and to stop and just take him to jail. *Id*.

Plaintiff names as defendants: Joseph Reyes, Neodesha Police Department Captain; and Shaun Petty, Neodesha Police Officer. For relief, Plaintiff seeks $50,000 from each officer and

injunctive relief in the form of asking for the officers' resignations.[1]  Plaintiff also seeks punitive damages.

## II.  The Report

The Report provides that Plaintiff was arrested by NPD officers on March 1, 2023. (Doc. 12, at 1; Ex. 1.)  The Report further provides that:

> NPD officials received a call from Ms. Barnett's mother informing them that Plaintiff was actively violating a PFA against him by remaining on Ms. Barnett's property. She also informed the dispatcher that Ms. Barnett was afraid of Plaintiff, which is why she obtained the PFA. (Ex. 1, Reyes Affidavit.)
> Captain Reyes and Officer Petty responded. Both officers were wearing bodycams and recorded the entire incident. Captain Reyes' bodycam footage is designated as Exhibit 2 and Officer Petty's video footage is designated as Exhibit 3. Upon arriving, Captain Reyes approached the camper and called out multiple times but received no response from Plaintiff. (Ex. 2, 1:20–2:01.) Captain Reyes could tell from movement within the camper that Plaintiff was inside but Plaintiff remained unresponsive. (Ex. 2, 2:02–05.) Captain Reyes instructed Plaintiff to step out emptyhanded but Plaintiff remained unresponsive. (Ex. 2, 5:36–6:04.)
> Instead of removing Plaintiff immediately, the officers decided to wait until Ms. Barnett arrived to give them permission to enter the camper. (Ex. 1, Reyes Affidavit.) About five minutes after Captain Reyes first approached the vehicle, Plaintiff began responding and claiming that Ms. Barnett was on her way to talk to the officers and that he had permission to be on the property. (Ex. 2, 7:02–9:40.)
> NPD Chief Sam Tomlinson briefly showed up to assess the situation. (Ex. 2, 10:22–18:01.)  Chief Tomlinson then departed the scene, instructing Captain Reyes and Officer Petty to leave Plaintiff in the camper if Ms. Barnett did not object to Plaintiff's presence. (Ex. 2, 18:01–32.)
> Ms. Barnett arrived approximately 23 minutes into the encounter. (Ex. 2, 24:06.) Upon arriving, Ms. Barnett told the officers that Plaintiff had permission to take the camper from the property but did not have permission to remain on her property. (Ex. 2, 24:20–26.) Ms. Barnett stated that she wanted Plaintiff to leave her property. (Ex. 2, 25:23–26.) Soon afterwards, Captain

---

[1]  The Court found in the M&O that to the extent Plaintiff seeks the termination of the officers in his request for relief, the Court is without authority to grant such relief.  *See* Doc. 6, at 9.

Reyes learned from dispatch that Plaintiff had an arrest warrant active in Wilson County. (Ex. 1.)

At that point, the officers reapproached the camper and told Plaintiff he would have to vacate the premises. (Ex. 2, 28:30–37.) Plaintiff continued to argue with the officers and shout contradictory excuses as to why he could not leave the camper. (Ex. 2, 28:40–31:25.) Plaintiff tried multiple times to get the officers to leave but Captain Reyes informed him that the officers would remain until Plaintiff vacated the premises. (Ex. 2, 33:35–52.)

Officer Petty then sought and received Ms. Barnett's permission to enter her camper. (Ex. 1, Reyes Affidavit.) Around 35 minutes into the encounter, Captain Reyes partially opened the door to the camper. (Ex. 2, 35:36.) Plaintiff responded by saying, "Hey don't come in here man, ain't nobody gave you no right to come in here man." (Ex. 2, 35:37–40.) Captain Reyes told Plaintiff they were coming in because Plaintiff refused to leave. (Ex. 2, 35:40–43.) Plaintiff continued to argue with Captain Reyes and claim that he was leaving. (Ex. 2, 35:43–36:02.)

As Plaintiff continued to argue, Captain Reyes fully opened the door to the camper. (Ex. 2, 36:02–03.) The video shows Plaintiff appearing in the doorway, gesticulating with hands full while continuing to argue with the officers. (Ex. 2, 36:03–07.) His hands were not above his head at any time. (Id.) The officers each laid ahold Plaintiff and ushered him out of the trailer. (Ex. 2, 36:08–12.)

As the officers led Plaintiff away from the trailer, he struggled and resisted letting the officers place his hands behind his back. (Ex. 3, 35:12–14.). Given Plaintiff's erratic behavior, refusal to obey instructions, and active resistance, Captain Reyes feared for his and Officer Petty's safety. (Ex. 1, Reyes Affidavit.) Officer Petty was similarly concerned for his own safety, as well as that of Captain Reyes and Plaintiff. (Ex. 4, Petty Affidavit.)

While Plaintiff continued actively resisting, the officers pushed Plaintiff toward a chain link fence so that his chest was on the top of the fence. (Ex. 2, 36:17; Ex. 3, 35:15.) Officer Petty then discharged his pepper spray can into Plaintiff's face. (Ex. 3, 35:18.) Captain Reyes was unaware at the time that Officer Petty had pepper sprayed Plaintiff. (Ex. 1, Reyes Affidavit.) As Plaintiff continued to struggle, the officers pulled him away from the fence and then pushed him to [the] ground so that they could get his arms behind his back. (Ex. 2, 36:25–27.) Plaintiff continued to shout at the officers "What the fuck?! What are you doing? Help me!" and other variations thereof. (Ex. 2, 36:27–37:07.) At one point, Plaintiff told the officers "My face is against the fence!" (Ex. 2, 36:45–46.) Nevertheless, Plaintiff continued actively resisting the

officers' attempts to handcuff him. (Ex. 2, 36:27–37:07; Ex. 1.) By struggling and wrestling with the officers, Plaintiff tore the meniscus in Officer Petty's right knee. (Ex. 4, Officer Petty Affidavit.) The injury was severe enough to require Officer Petty to attend roughly two months of physical therapy after the incident. (Ex. 4, Petty Affidavit.)

After Plaintiff was finally handcuffed, the officers helped Plaintiff to his feet. (Ex. 2, 37:28–30.) For a while, Plaintiff continued struggling and ignoring the officers' orders. (Ex. 1, Reyes Affidavit; Ex. 2, 37:20–38:20.) Despite Plaintiff's belligerence, the officers escorted Plaintiff to Captain Reyes' police vehicle. (Ex. 2, 38:20–38:42.) Captain Reyes asked EMS to come to the scene to address Officer Petty's injured knee. (Ex. 2, 38:00–02.) Captain Reyes then searched Plaintiff and discovered an electronic cigarette pod that smelled like (and later tested presumptively positive for) marijuana. (Ex. 1, Reyes Affidavit.) The officers placed Plaintiff in Captain Reyes' police vehicle to await EMS. (Ex. 2, 39:39–42.) Weather reports from Neodesha on March 1, 2023, indicate the temperature reached a high of 61 degrees—not 80 degrees as Plaintiff claims.[2]

When EMS arrived, they gave Plaintiff saline drops to wash out his eyes. (Ex. 2, 46:11–47:18.) At no point did EMS intentionally drip saline solution onto Plaintiff's genitals. (See generally Ex. 2.) Although Plaintiff kept complaining about the pepper spray in his eyes, he never mentioned or complained losing any teeth. (See generally Ex. 2; see also Ex. 1, Reyes Affidavit; Ex. 4, Petty Affidavit.) However, Plaintiff did experience some mild cuts on the right side of his face where it had been pressed against the fence. (See Ex. 2, 45:01–03.)

Plaintiff was charged with (1) interference with Law Enforcement Officers; (2) possession of a controlled substance (marijuana); and (3) use/possession with intent to use drug paraphernalia. As the Court has already noted in its Memorandum and Order, Plaintiff pleaded no contest to each of the charges. (See Doc. 6.)

(Doc. 12, at 3–6.)

## III. Discussion

### A. Excessive Force

"Excessive force claims are cognizable under the Fourth, Fifth, Eighth, and Fourteenth

---

[2] (See Ex. 5, https://www.wunderground.com/history/daily/us/ks/neodesha/KJLN/date/2023-3-1.)

Amendment, depending on where in the criminal justice system the plaintiff is at the time of the challenged use of force." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1169 (10th Cir. 2021) (citation omitted). "When an 'excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment.'" *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

"To state an excessive force claim under the Fourth Amendment, plaintiffs must show *both* that a seizure occurred and that the seizure was unreasonable." *Id.* (quoting *Bond v. City of Tahlequah*, 981 F.3d 808, 815 (10th Cir. 2020) (emphasis in original) (quotation marks omitted)). In assessing reasonableness, a court "looks at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." *Id*. (quoting *Emmett v. Armstrong*, 973 F.3d 1127, 1135 (10th Cir. 2020)). The inquiry is an objective one, and one that considers the totality of the circumstances. *Id*. (citation omitted). Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (quoting *Graham*, 490 U.S. at 396). "The right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion . . . to effect it." *Edwards v. City of Muskogee, Oklahoma*, 841 F. App'x 79, 83 (10th Cir. 2021) (unpublished) (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010) (internal quotation marks omitted)). "Reasonableness does not require that officers use alternative or less intrusive means if the conduct is otherwise reasonable." *Arnold v. City of Olathe, Kansas*, Case No. 2:18-cv-02703-HLT, 2021 WL 3129408, at *8 (D. Kan. July 23, 2021) (citation omitted).

The Supreme Court in *Graham* outlined three factors that guide the reasonableness analysis: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Vette*, 989 F.3d at 1169 (quoting *Graham*, 490 U.S. at 396). In evaluating the third factor, a court considers "whether the plaintiff was fleeing or actively resisting at the 'precise moment' the officer employed the challenged use of force." *Id*. (citation omitted). The Tenth Circuit has also held that "initial resistance does not justify the continuation of force once the resistance ceases." *McCoy v. Meyers*, 887 F.3d 1034, 1051 (10th Cir. 2018) (citations omitted).

The Court has viewed the body camera videos submitted as exhibits to the Report, and finds that the Report accurately describes the incident as captured on the videos. Considering the *Graham* factors, the Report shows that Plaintiff was violating a PFA order by being on the property, and that he refused multiple requests for him to leave the property over a span of over 35 minutes. Plaintiff did not come out of the trailer with his hands up in a "surrender position," but rather the officer had to pull the door open. Plaintiff's hands were full of items, at his side, and moving around. At no point were his hands above his head. The officers had to grab his arms and lead him out of the trailer. Plaintiff does not put his hands behind his back, but asks why they are trying to handcuff him. The video shows Plaintiff hanging onto the fence instead of cooperating with the officer's attempts to handcuff him. At no point does the video show Plaintiff's neck pressed against the spikes at the top of the chain link fence. Plaintiff appears to be actively resisting at the precise moment the officers employed the challenged use of force, and the force ceased once the resistance ceased.

The video does not show officers carrying Plaintiff to the patrol car. They helped him up and helped him walk to the vehicle. The video does not show EMS purposefully dripping saline on his shorts or legs, and at no point does he mention anything about his teeth. The video does not show Officer Reyes taunting him from outside the patrol car. Officer Reyes placed Plaintiff in the vehicle and then returned to the trailer to take photographs. When he returned a couple of minutes later Plaintiff was removed from the vehicle and assessed by EMS.

**B. Heck Bar**

Online district court records show that Plaintiff pleaded no contest to: 1) Interference with LEO; obstruct/resist/oppose misdemeanor warrant service or execution; 2) Possession of marijuana; and 3) Use/possess w/intent to use drug paraphernalia into human body. *See State v. Blackburn*, Case No. 2023-CR-000054 (District Court of Wilson County, Kansas). Plaintiff was sentenced to probation. The Court noted in the M&O that if Plaintiff's claim in this case would necessarily imply the invalidity of his conviction, the claim may be barred by *Heck*. *See Heck v. Humphrey*, 512 U.S. 477 (1994). In *Heck v. Humphrey*, the United States Supreme Court held that when a state prisoner seeks damages in a § 1983 action, the district court must consider the following:

> whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Id*. at 487. In *Heck*, the Supreme Court held that a § 1983 damages claim that necessarily implicates the validity of the plaintiff's conviction or sentence is not cognizable unless and until the conviction or sentence is overturned, either on appeal, in a collateral proceeding, or by executive order. *Id*. at 486–87.

The Court noted that it is possible that Plaintiff's excessive force claim may not be barred

by *Heck*, depending on the facts surrounding his arrest. "An excessive-force claim against an officer is not necessarily inconsistent with a conviction for assaulting the officer." *Torres v. Madrid*, 60 F.4th 596, 600 (10th Cir. 2023) (citing *Havens v. Johnson*, 783 F.3d 776, 782 (10th Cir. 2015)). "For example, the claim may be that the officer used too much force to respond to the assault or that the officer used force after the need for force had disappeared." *Id.* "[I]n cases where there are multiple uses of force or a continuing use of force, *Heck* may bar the plaintiff's claims as to some force but not all." *Id*. at 600–01 (citing *Hooks v. Atoki*, 983 F.3d 1193, 1197, 1201 (10th Cir. 2020) (although *Heck* barred plaintiff, who had pleaded no contest to two counts of assault and battery on a police officer, from bringing excessive-force claims based on four uses of force involved in subduing him, "[t]he fifth and sixth uses of force [we]re different" and thus not barred by *Heck* because plaintiff had alleged that he "no longer posed a threat")).

In *Torres*, the Tenth Circuit reversed the decision finding plaintiff's claims were barred by *Heck* as inconsistent with plaintiff's no-contest pleas to charges of aggravated flight from a law-enforcement officer and assault upon a peace officer "because her pleas are not inconsistent with her claims that the officers used excessive force by firing at her after she had driven past them and no longer posed a threat to them." *Id*. at 599–600. "The analysis of whether *Heck* bars the entirety of a plaintiff's excessive-force claims thus requires 'compar[ing] the plaintiff's allegations to the offense [s]he committed." *Id*. at 601 (citing *Havens*, 783 F.3d at 782).

In this case, Plaintiff alleges that officers used excessive force when they removed him from the trailer and placed him in handcuffs. Plaintiff pled no contest to Interference with LEO—obstruct/resist/oppose misdemeanor warrant service or execution. Nothing in the Report or videos shows that force was used after Plaintiff was restrained. Plaintiff's excessive force claim is subject to dismissal.

Based on the Report, the Court is considering dismissal of Plaintiff's claims. However, the Court will grant Plaintiff an opportunity to respond to the Report and to show good cause why his claims should not be dismissed for failure to state a claim.

## IV. Response Required

The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987). The report "is treated like an affidavit, and the court is not authorized to accept the factual findings of the prison investigation when the plaintiff has presented conflicting evidence." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (citing *Sampley v. Ruettgers*, 704 F.2d 491, 493 n. 3 (10th Cir. 1983)). Thus, at this point in the proceedings the Court does not use the Report to resolve conflicts of fact. *See Swoboda v. Duback*, 992 F.2d 286, 290 (10th Cir. 1993) ("In determining whether a plaintiff has stated a claim, the district court may not look to the Martinez report, or any other pleading outside the complaint itself, to refute facts specifically pled by a plaintiff, or to resolve factual disputes."). However, the Tenth Circuit has held that "[w]here the video evidence blatantly contradicts a material fact allegation, we may disregard that allegation in favor of what is actually depicted on the video." *Blake v. Wallace*, 2024 WL 5087805, at *2 (10th Cir. Dec. 12, 2024) (unpublished) (citation omitted). In light of the Report, the Court is considering dismissal of this matter for failure to state a claim.

Plaintiff will be given an opportunity to respond to the Report and to show good cause why dismissal should not be entered. Failure to respond by the Court's deadline may result in dismissal of this action without further notice for failure to state a claim.

11

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff is granted until **April 7, 2025,** in which to respond to the Report at Doc. 12, and to show good cause, in writing to the undersigned, why Plaintiff's claims should not be dismissed for the reasons stated herein.

**IT IS SO ORDERED**.

Dated March 7, 2025, in Kansas City, Kansas.

<u>S/ John W. Lungstrum</u>
JOHN W. LUNGSTRUM
UNITED STATES DISTRICT JUDGE